# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES CELLULAR OPERATING
COMPANY, LLC,

        Plaintiff,

  v.                                          Case No. 08-CV-796

WAUKESHA COUNTY, and
WAUKESHA COUNTY BOARD OF ADJUSTMENT,

        Defendants.

_____

# ORDER

On September 19, 2008, plaintiff, United States Cellular Operating Company, LLC (USCOC), filed suit against defendants as a result of defendants' attempts to require USCOC to reduce the height of its telecommunications tower ("the Tower") located at W230 N233 Wolf Road, Pewaukee, Waukesha County, Wisconsin. USCOC's complaint contains two counts. The first of which seeks a declaratory judgment and the issuance of a writ of mandamus ordering defendant Waukesha County Board of Adjustment ("the Board") to grant plaintiff a variance for the Tower, while the second count seeks a permanent injunction preventing either Waukesha County ("the County") or the Board from removing the Tower. The parties have submitted cross-motions for summary judgment on plaintiff's claims.

# BACKGROUND

Defendants' unopposed findings of fact establish the following.[1] In 1964, the County enacted a height limitation zoning ordinance ("HLZO") to regulate the use of property and the height of structures in the vicinity of the Waukesha County Airport. (Defs. Prop. Findings of Fact ("DPFF") [Dkt. #24] ¶ 1). In 1987, USCOC constructed the Tower on property located in an area subject to the HLZO (Id. ¶ 2), however, no permit was obtained from the County for the construction of the Tower. (Id. ¶ 3). At the time the tower was constructed, the HLZO would have allowed a maximum height of 142 feet; however, the HLZO was amended in 1995 so as to allow a maximum height of 50 feet. (Id. ¶¶ 4-5). The current height of the Tower is 161 feet with antennae extending to a total height of 172 feet. (Id. ¶ 4).

On June 27, 2008, USCOC filed an application with the Board for a variance from the HLZO. (Id. ¶ 7). On August 13, 2008, the Waukesha Airport Commission met and provided a recommendation to the Board to deny the variance for the Tower. (Id. ¶ 8). On the same date, the Board held a hearing on plaintiff's request for a variance. (Id. ¶ 9). The Board ultimately denied the request for a variance. (Id.).

---

[1] Plaintiff only disputed four of defendants' proposed findings of fact; the remainder are, therefore, deemed admitted, and the court may rely on them in resolving the dispute.

**ANALYSIS**

**I. Summary Judgment Standard**

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

**II. USCOC's Claims**

USCOC requests that this court enter a declaratory judgment holding that the Board's refusal to grant a variance is a violation of the Telecommunications Act of 1996, 42 U.S.C. § 332, *et seq*. Plaintiff also requests that this court issue a writ of mandamus ordering the Board to grant plaintiff the variance it was denied. Plaintiff further requests that this court grant a permanent injunction preventing defendants

3

from removing the Tower. USCOC proffers several different rationales for such relief.

### A. 47 U.S.C. § 332

According to 47 U.S.C. § 332:

> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--
>
> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C. § 332(c)(7)(B)(I). Plaintiff argues that the Board's denial of plaintiff's requested variance violates 47 U.S.C. § 332(c)(7)(B)(i)(I) & (II). The statute also requires that:

> (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7)(B)(iii). Plaintiff also maintains that the Board's decision to deny plaintiff the requested variance was not supported by substantial evidence.

#### 1. Unreasonable-Discrimination Claim

To state a claim that a municipality's regulation "unreasonably discriminates among providers of functionally equivalent services" plaintiff must allege that the municipality has discriminated against plaintiff, and that such discrimination was unreasonable. The purpose of the anti-discrimination provision is to prevent

4

municipalities from granting preferential treatment to one provider over another. *APT Minneapolis, Inc. v. Eau Claire County*, 80 F. Supp. 2d 1014, 1023 (W.D. Wis 1999) (citing *Aegerter v. City of Delafield, Wis.*, 174 F.3d 886, 892 (7th Cir. 1999)). The provision does not prohibit all discrimination, only unreasonable discrimination. Hence, "a municipality may reasonably take the location of the telecommunications tower into consideration when deciding whether to grant an application." *APT Minneapolis*, 80 F. Supp. 2d at 1024 (citing *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 638-39 (2d Cir.1999)).

Defendants' correctly point out that plaintiff has essentially alleged no facts in support of its unreasonable-discrimination claim. The only facts in USCOC's complaint which are alleged in support of the unreasonable-discrimination claim is the fact that the Board, within a few months of denying plaintiff's request, also denied a similar HLZO variance for a neighboring tower that had been in existence since 1951. Plaintiff alleges that the neighboring tower (in which USCOC holds no ownership interest of any kind) uses a microwave technology similar to USCOC's technology, and that the neighboring tower has a telecommunications company as a tenant on the tower. Plaintiff states that the Board's denial of its request for a variance and the neighboring tower's request for a variance "has the effect of unreasonably discriminating among communications and telecommunications providers." (Compl. ¶ 38).

5

USCOC's assertion appears hopelessly contradictory.  To allege discrimination, plaintiff must allege that defendants have treated different, yet similarly situated, providers differently. However, by denying plaintiff's variance and the neighboring tower's variance, defendants treated different, yet similarly situated, providers the same, not differently.  Thus, the only possible reading of USCOC's assertion that makes any sense would be to read it as alleging that by denying variances for two towers housing telecommunications companies, the defendants are discriminating against telecommunications companies, and in favor of communications companies.[2]

However, even if the latter understanding of plaintiff's allegation is the correct understanding, the result is the same – defendants' are entitled to summary judgment on the claim. The unreasonable-discrimination provision of § 332 prohibits discrimination "among providers of functionally equivalent services." Plaintiff has not even alleged that "communications" providers and "telecommunications" providers are providers of "functionally equivalent services."  Nor has plaintiff pointed to a single instance of a "communications" provider receiving treatment different from that received by a "telecommunications" provider.  At the end of the day, plaintiff has utterly failed to make even the most basic factual allegations necessary to support an unreasonable-discrimination claim.

---

[2] The court has no way of knowing if this is actually what USCOC meant; however, plaintiff's complaint is so inartfully drafted that the court simply must make certain assumptions as to its claims.

6

### 2. Prohibiting Services Claim

To state a claim that a municipality's regulation "prohibits or ha[s] the effect of prohibiting the provision of personal wireless services," plaintiff must allege that its "existing application is the only feasible plan" and that "there are no other potential solutions to the purported problem." *Second Generation Props. L.P. v. Town of Pelham*, 313 F.3d 620, 630, 635 (1st Cir. 2002) (quoted in *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 834 (7th Cir. 2003)). The question of whether a particular zoning decision violates the anti-prohibition clause is a question "that a federal district court determines in the first instance without any deference to the [zoning] board." *National Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002) (quoted in *VoiceStream*, 342 F.3d at 833). However, the "provider carries [a] 'heavy' burden," *Voicestream*, 342, F.3d 834 (quoting *Town of Pelham*, 313 F.3d at 629), especially in situations such as the instant case, where the provider is claiming that it must be allowed to operate at a specific site. *See 360 Degrees Communications Co. of Charlottesville v. Bd. of Supervisors of Albemarle County*, 211 F.3d 79, 86 (4th Cir. 2000) (stating that, "conceptually, if wireless service could feasibly be provided from only one site, a denial of a permit for a facility at that site could amount to a prohibition of wireless services, in violation of (B)(i)(II)," but noting that such a situation is "unlikely in the real world") (cited and quoted in *VoiceStream*, 342 F.3d at 834). Ultimately, if the "provider has not investigated thoroughly the possibility of other viable alternatives,

7

the denial of an individual permit does not 'prohibit or have the effect of prohibiting the provision of personal wireless services.'" *VoiceStream*, 342 F.3d at 835.

USCOC appears[3] to assert two arguments in support of its anti-prohibition claim. The first argument is that if the variance is not granted, and plaintiff must either remove the Tower or lower it to fifty feet, then one of its tenants on the Tower, USA Mobility ("USAM"), will resultingly suffer a gap in coverage that it has no feasible means of correcting.[4] The second argument is that if the variance is not granted, and plaintiff must either remove the Tower or lower it to fifty feet, then plaintiff itself will suffer a coverage gap that it has no feasible means of correcting with a single replacement tower.

As to the first argument, the court finds that the evidence adduced simply does not support plaintiff's position. Plaintiff's sole evidence in support of its argument that denial of the variance would produce an uncorrectable gap in USAM's coverage

---

[3] Plaintiff's various arguments are so poorly organized and articulated that the court simply cannot be sure what exactly plaintiff is arguing at times.

[4] Ultimately, the court finds that plaintiff has simply not adduced sufficient evidence to support the claim that removing the Tower would violate the "anti-prohibition" clause as a result of causing an uncorrectable gap in USAM's service. However, the court also notes that such an argument appears to raise an issue as to standing. Neither party identified standing as an issue in this case. Nonetheless, the court questions whether plaintiff has standing to assert the argument that removal of its Tower would violate § 332(c)(7)(B)(i)(II) by causing an uncorrectable gap in USAM's service. Perhaps as the owner of the Tower plaintiff does have standing to make such an argument. However, even if plaintiff does have standing, the court further notes that though neither of the parties identified it as an issue either, USAM's absence from this litigation could have implications under Fed. R. Civ. P. 19(a)(B)(i). Thus, though the court finds that defendants are entitled to summary judgment on all of plaintiff's claims, the court notes that such a ruling only is valid to the extent that USAM"s absence from this litigation does not violate Fed. R. Civ. P. 19(a)(B)(i).

8

is the testimony of Mr. Jack Warden.[5] Warden testified that removal of the Tower would produce a gap in USAM's service. However, the following excerpt from Warden's transcript evidences that the sufficiency of possible alternatives have not been adequately investigated to substantiate USCOC's claim:

> Q: Have you done anything to investigate alternative locations for the antennas that you have on [the Tower]?
> A: At the present time, no.
> Q: Do you know if [USAM] has done anything, apart from what you have done or not done, to investigate locations for the antennas that are on [the Tower]?
> A: I don't know.
> * * *
> Q: And just to put a finer point on it, specific to this particular tower, you haven't looked at alternative locations, whether a new tower site or a co-location site for your antennas that are on [the Tower]?
> A: No, I have not.

(Br. Supp. Mot. S.J. [Dkt. #19], Ex. F). Thus, while it may well be that removing the Tower would create a gap in USAM's service, USCOC simply has not produced any evidence that anyone has "investigated thoroughly the possibility of other viable alternatives." *VoiceStream*, 342 F.3d at 835. Thus, according to the standard

---

[5] Jack Warden is the owner of Warden's Communication Service, a company that leases space on the Tower, and then subleases that space to USAM. The court literally had to comb through the docket in order to figure out just who Jack Warden is; this could have been avoided if the parties had simply filed the entirety of his deposition testimony instead of merely a few excerpts. Indeed, anytime two parties are going to be citing to the same witness's deposition, the parties should file the entirety of the deposition (or at least all portions that are going to be cited) in one docket entry. That way the parties can simply cite to that one docket entry anytime they want to cite to that witness's deposition. Such a system is demonstrably better than that employed by the parties in the instant case, wherein the parties have filed numerous excerpts of Mr. Warden's testimony, spread out over several docket entries, thus sending the court on the proverbial "archaeological dig" whenever the court needs to refer to Mr. Warden's (or any other witness's) deposition. Such an antiquated methodology makes no sense given the advent of electronic filing. (For guidance as to how to use the electronic filing system in such a way as to reduce clutter, promote clarity, and ensure efficiency, the parties should see 07-CV-926, Docket #215, Scheduling Order dated 2/2/2010).

9

adopted by the Seventh Circuit, "the denial of plaintiff's variance does not prohibit or have the effect of prohibiting the provision of USAM's wireless service. *Id.*

As to plaintiff's second argument regarding the anti-prohibition clause, the court finds that plaintiff has not even alleged an anti-prohibition claim with such argument. Plaintiff states that it would suffer a coverage gap in its wireless services if the Tower were removed because "it could not provide coverage with a single replacement tower." (Pl. Br. Opp. Mot. S.J. [Dkt. 28] at 4). Plaintiff's allegation that it could not provide coverage *with a single replacement tower* is an extraordinarily far cry from the requisite allegation – namely that the "existing application is the only feasible plan" and that "there are no other potential solutions to the purported problem."[6] *Town of Pelham*, 313 F.3d at 630, 635 (quoted in *VoiceStream*, 342 F.3d at 834).

Neither of plaintiff's proffered arguments regarding its anti-prohibition claim are compelling. The only evidence plaintiff produced in support of its first argument is the testimony of Mr. Warden, who himself admits that he has not conducted any investigation into viable alternatives, nor is he aware of anyone who has. Plaintiff's second argument is a complete non-starter, because it presupposes that relocating the Tower as a single tower is "the only feasible plan" and that "there are no other potential solutions to the purported problem." There is absolutely no rationale given

---

[6] The fact is, a formal analysis conducted by plaintiff's Radio Frequency Engineer, Mr. Kevin Fraley, determined that plaintiff's current level of coverage could be maintained and even improved through the use of two towers. (DPFF ¶ 36)

10

for why this would be true; nor is it even argued that such presupposition actually is true. Accordingly, defendants are entitled to summary judgment on USCOC's anti-prohibition claim, in accordance with the limits articulated in footnote four.

### 3. Substantial Evidence Claim

To state a claim that the Board's denial of the variance request was not supported by substantial evidence, USCOC must allege that the Board "was clearly in error to turn down [its] application, in light of the evidence that had been placed before the [Board]." *PrimeCo Personal Commc'ns, L.P. v. City of Mequon*, 352 F.3d 1147, 1148 (7th Cir.2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *VoiceStream*, 342 F.3d at 830. "The party seeking to overturn the local zoning board's decision has the burden of proving that the decision is not supported by substantial evidence." *Helcher v. Dearborn County*, 595 F.3d 710, 723 (7th Cir. 2010).

The Board's decision to deny USCOC's request for a variance states in relevant part:

> The tower was erected improperly and in contravention of the HLZO and for safety reasons it needs to be lowered to conform with the HLZO. The continued presence of the tower is not in the public's interest, as it is a danger to air traffic patterns of the Waukesha County Airport.

(DPFF ¶ 42). The Board considered several different forms of evidence in reaching this decision. It considered the Staff Report of the County's Planning and Zoning

11

Department. The report recommended the denial of plaintiff's requested variance, and contained the following findings:

> The subject tower is in very close alignment with the approach and take off patterns of the east-west primary runway at the Waukesha County Airport.
> * * *
> The tower with its excessive height and being in the approach and take off patterns, is in a much more vulnerable position relative to the pilots use of the airport as they approach or take off from the east-west runway and therefore the height zones near the ends of said airport runways, are more critical than in other quadrants which are not in said approach and take off patterns.
> * * *
> There is no evidence in the applicant's submittal, that any other locations have been considered to replace this tower.

(DPFF ¶ 38). The Board also considered a letter from Gary Dikkers – an Airspace Manager with the Wisconsin Department of Transportation, Bureau of Aeronautics – to plaintiff, which stated:

> As this airport has been improved and developed to allow use of new aircraft with advanced navigation capabilities, this tower has the potential to become a limiting factor in the airport's ability to have a useful instrument approach, with low minimums when aircraft approach from the east and land on runway 28.
>
> Since there are no records indicating the original tower proponent asked for and was granted permission to exceed the county's HLZO limit, it is our opinion the tower should be lowered and brought into compliance with the HLZO.

(DPFF ¶ 41).[7] The Board also considered the testimony of two of USCOC's witnesses, Mr. Warden and Mr. Kevin Fraley (plaintiff's Radio Frequency Engineer). These witnesses' testimony was ostensibly produced to substantiate the notion that denial of the variance would produce an uncorrectable gap in coverage for USAM and plaintiff, respectively. However, as already explained, Mr. Warden's testimony evidences that alternative locations for USAM's antennas had not been conducted. Similarly, at the time of the meeting, Mr. Fraley had not done any formal analysis of alternative sites for the Tower.[8]

The above cited evidence adequately supports the notion that denial of the variance was justified on safety grounds, and that there was no evidence of undue hardship to plaintiff or its tenants. The only evidence presented that would undermine such a determination were two instances in which the Federal Aviation Administration issued a "Determination of No Hazard to Air Navigation" to plaintiff regarding the Tower. (Decl. Carter [Dkt. #23], Ex. E). However, defendants point out several unopposed facts which substantially lessen the import of the FAA's determinations. First, the FAA reviews are not permit applications, nor is the FAA a permitting authority, nor do the FAA determinations require that a local municipality

---

[7] Plaintiff maintains the Board should not have considered Mr. Dikker's opinion (or at least should have discounted it) because "his duty is to protect local airspace and, when asked to render an opinion, he will support the local government body," thus "his opinion is clearly biased." (Pl. Br. Supp. Mot. S.J. [Dkt. #21] at 3, n. 1). However, plaintiff cites absolutely no support for this assertion. More importantly, plaintiff does not even dispute the substance of Mr. Dikkers's opinion, namely that the Tower's height could hinder the airport's ability to adopt advanced computerized landing systems.

[8] Apparently, subsequent to the hearing, Mr. Fraley did conduct a formal analysis, in which he determined that the Tower could not be relocated as a single tower, but that if two towers were used, then plaintiff's current level of coverage could be maintained and even improved to some degree.

with HLZO authority approve or deny a particular tower application. (DPFF ¶¶ 15-16). Also, the FAA determinations are based on the existing approaches at the airport. (DPFF ¶ 25). However, if the Tower were in compliance with the HLZO, then the FAA could redesign the approaches, and lower the descent minimums[9] which would be more useful for pilots. Additionally, the FAA determinations do not address the Tower's potential impact on the airport's ability to upgrade its computerized approach systems (from an "instrument approach" to a "precision approach").[10]

In addition to the FAA determinations, plaintiff points to the fact that the Tower has been at its current location since 1987 without incident. However, this argument ignores the Board's point as to the potential impact of the Tower on the airport's ability to upgrade its approach systems. This argument also fails to take into account the increase in air-traffic experienced, and expected, by the airport. Also, as a general matter, the absence of an accident does not prove safety. A zoning board that ignored what it considered to be an unsafe tower near an airport simply because no accident had yet occurred as a result of such tower would certainly be shirking its obligations to the public.

---

[9] The descent minimum is the point at which the pilot must have the airport physically in sight in order to land. (DPFF ¶ 71)

[10] A precision approach gives both horizontal and vertical guidance to a predetermined point above the ground, whereas a nonprecision approach only gives horizontal guidance. (DPFF ¶ 19). A precision approach allows for much lower descent minimums (200 feet for precision versus 1000 feet for nonprecision), thus enabling pilots to land in a greater diversity of weather conditions than is possible with out precision approach. (DPFF ¶¶ 19-21).

14

The totality of the evidence before the Board supported findings that while the FAA did not consider the Tower, given the current approaches, to be a danger, there was reason to believe that the Tower does present a hazard to planes using the airport. There was also reason to believe that it's presence would hamper the airport's ability to upgrade its approach system, to accommodate increased air-traffic, and to facilitate planes landing in a greater diversity of weather (such as where there are clouds above 200 feet but below 1000 feet). The Board was also justified in determining that plaintiff had not established that denial of the variance would produce undue hardship on plaintiff or it tenants. Hence, the court has no problem finding that the Board's decision was supported by substantial evidence, especially considering the fact that "[t]he substantial evidence test is highly deferential to the local board." *Town of Pelham*, 313 F.3d at 627 (1st Cir. 2002) (quoted in *VoiceStream*, 342 F.3d at 830).

**B.    Estoppel Claim**

In plaintiff's motion for summary judgment, plaintiff argues that defendants are estopped from reducing the height of the Tower. Plaintiff did not allege any claim based on estoppel in its complaint. Typically, the court will not consider claims raised for the first time at the summary judgment phase of proceedings. *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 412 (7th Cir. 2009) (*citing Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir.2002) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary

15

judgment." (quotations omitted)). However, even if the merits of plaintiff's estoppel claim are considered, plaintiff is clearly not entitled to relief on such claim.

The elements of estoppel are: (1) action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, in either action or non-action; and (4) which is to his or her detriment. *Miles v. Labor Assoc. of Wisconsin, Inc.*, 571 N.W.2d 656, 660 (Wis. 1997). Plaintiff argues[11] that because the County allowed the Tower to stand for 19 years in violation of the HLZO without taking any action against plaintiff, thus inducing plaintiff to reasonably rely, to its detriment, on that non-action, the County is now estopped from enforcing the HLZO against the Tower.

The first prong is fulfilled because it is true that the County did not act for the first 19 years that the Tower was standing. The second prong is fulfilled because estoppel is being asserted against the County, and the County is the party that did not act. It is unclear whether or not the fourth prong would be fulfilled. The detriment cannot be the cost of reducing the Tower to comply with the HLZO, because that cost would be incurred as a result of plaintiff's violation of the HLZO, not as a result of the County's failure to enforce the HLZO against the Tower once it was built. However, plaintiff has alleged that the Tower was one of its original towers in the area, and that many of its subsequent towers have been positioned based on the existence of the Tower. However, no information is given as to when

---

[11] Just like plaintiff's complaint, as well as its other arguments regarding summary judgment, plaintiff's estoppel argument is very poorly articulated.

16

these additional towers were situated (if they were situated within a year or two after the construction of the Tower, then that would drastically undermine plaintiff's estoppel argument). Additionally, no information is given as to what detriment plaintiff will suffer as a result of having to comply with the HLZO. Mr. Fraley testified that the Tower cannot be relocated as a single tower, but that a two-tower solution plaintiff has identified would result in better coverage. It seems that plaintiff's best arguments would be that had the County acted sooner, plaintiff would have placed its towers in a completely different manner throughout the area (though plaintiff would need to explain why not doing so results in a detriment), or that if the County acted sooner, plaintiff could have relocated the Tower as a single tower (again, plaintiff would need to explain why its inability to do so results in a detriment).

Regardless of the numerous questions regarding the fourth prong, the court finds that plaintiff's estoppel argument fails on the third prong. The court finds that the County's inaction against the Tower did not induce plaintiff to reasonably rely on said inaction. This is because,"proof of estoppel must be clear, satisfactory, and convincing and is not to rest on mere inference and conjecture[,]" and "the party asserting the estoppel must demonstrate that the act relied upon was done knowingly or with the intent that it be relied upon." *Variance, Inc. v. Losinske*, 237 N.W.2d 22 (1976) (quoted in *Russ ex rel. Schwartz v. Russ*, 2006 WL 3491386 *6 (Wis. App. 2006)). Plaintiff's proof of estoppel is far from "clear, satisfactory, and convincing," and there is simply no basis for alleging that the County's inaction was

17

done knowingly or "with the intent that it be relied upon." Further, the court, on a much more basic level, finds that any reliance[12] by plaintiff on the County's inaction was unreasonable. Simply knowing the nature of an airport (i.e., that over time its traffic will increase, and the technology it utilizes will need to be upgraded), plaintiff cannot be said to have been reasonable in thinking that simply because a non-conforming tower was not acted against during the first decade or so of its existence, that it would never be acted against. Ultimately, any reasonable actor would have known that if the Tower, because of its non-conformance, was ever determined to be a hazard – as a result of changes occurring at the airport, or simply as a result in changes in the makeup of the oversight body – then it would be the Tower that would have to adapt, not the airport. For all of these reasons, plaintiff's estoppel argument must fail.[13]

## CONCLUSION

For the reasons stated above, defendants are entitled to summary judgment as to all of plaintiff's claims. Plaintiff requested that if plaintiff was not awarded summary judgment on its claims, that, in the alternative, the court order that plaintiff

---

[12] At the most fundamental level, the court questions whether plaintiff can even be said to have "relied" on the County's inaction. The evidence suggests that plaintiff did not even realize that the Tower violated the HLZO. To "rely" is an affirmative act. How can plaintiff be said to have "relied" if it had no clue that the County was even engaging in "inaction" vis a vis the Tower? This is all academic though, and has no bearing on the substance of the court's decision.

[13] The fact that plaintiff did not allege an estoppel claim in its complaint means that defendants did not move for summary judgment on the estoppel claim. The court is denying plaintiff's motion for summary judgment as to its estoppel claim, but typically that would simply mean that the issue should proceed to trial. However, since the complaint was never amended to add an estoppel claim, the court finds that the claim should fall out completely.

18

should not have to reduce the tower lower than what would have been required under the terms of the HLZO in 1987, as opposed to the lower 1995 limitations. Plaintiff proffers no argument in support of this requested relief, and it is thus denied as well.

Accordingly,

**IT IS ORDERED** that plaintiff's Motion for Summary Judgment (Docket #20) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that defendants' Motion for Summary Judgment (Docket #18) be and the same is hereby **GRANTED**, and this action is hereby **DISMISSED**.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of May, 2010.

BY THE COURT:

*[signature]*

J.P. Stadtmueller
U.S. District Judge